# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

_____

**SARAH J. GAGNON,**

                                **Plaintiff,**

               **v.**

**COMMISSIONER OF SOCIAL
SECURITY,**

                                **Defendant.**

_____

**7:14-cv-1194
(GLS)**

**APPEARANCES:**

**FOR THE PLAINTIFF:**
Conboy, McKay Law Firm
307 State Street
Carthage, NY 13619

**FOR THE DEFENDANTS:**
HON. RICHARD S. HARTUNIAN
United States Attorney
100 South Clinton Street
Syracuse, NY 13261

Steven P. Conte
Regional Chief Counsel
Office of General Counsel, Region II
26 Federal Plaza, Room 3904
New York, NY 10278

**Gary L. Sharpe
Senior District Judge**

**OF COUNSEL:**

LAWRENCE D. HASSELER,
ESQ.

PETER W. JEWETT
Special Assistant U.S. Attorney

## MEMORANDUM-DECISION AND ORDER

## I. Introduction

Plaintiff Sarah Gagnon challenges the Commissioner of Social Security's denial of Supplemental Security Income (SSI) and Child's Insurance Benefits (CIB), seeking judicial review under 42 U.S.C. § 405(g). (Compl., Dkt. No. 1.) After reviewing the administrative record and carefully considering Gagnon's arguments, the court affirms the Commissioner's decision and dismisses the complaint.

## II. Background

On May 18 and 20, 2011, respectively, Gagnon filed applications for SSI and CIB under the Social Security Act ("the Act"), alleging an onset date of May 1, 2011. (Tr.[1] at 93, 99, 181-91.) After her applications were denied, (*id.* at 107-114), Gagnon requested a hearing before an Administrative Law Judge (ALJ), which was held on November 7, 2012, (*id.* at 31-92, 117). On December 12, 2012, the ALJ issued an unfavorable decision and found that Gagnon was not disabled. (*Id.* at 6-24.) That decision became the final decision of the Commissioner when the Appeals Council denied Gagnon's request for review. (*Id.* at 1-4.)

---

[1] Page reference preceded by "Tr." are to the administrative transcript. (Dkt. No. 10.)

Gagnon commenced this action by filing her complaint on September 30, 2014.  (*See generally* Compl.)  The Commissioner filed an answer and a certified copy of the administrative transcript.  (Dkt. Nos. 8, 10.)  Each party, seeking judgment on the pleadings, filed a brief.  (Dkt. Nos. 11, 12.)

## III.  **Contentions**

Gagnon contends that the Commissioner's decision is tainted by legal error and not supported by substantial evidence.  (Dkt. No. 11 at 10-25.)  Specifically, Gagnon argues that the ALJ erred by improperly: (1) evaluating whether her severe impairments met or equaled the neurological listings at step three; (2) weighing the medical evidence; and (3) assessing her credibility.  (*Id.*)  The Commissioner opposes and asserts that the ALJ used the appropriate legal standards and her decision is also supported by substantial evidence.  (Dkt. No. 12 at 4-12.)

## IV.  **Facts**

The court adopts the undisputed factual recitations of the parties and the ALJ.  (Dkt. No. 11 at 1-10; Dkt. No. 12 at 2; Tr. at 11-19.)

## V.  **Standard of Review**

The standard for reviewing the Commissioner's final decision under

42 U.S.C. § 405(g)[2] is well established and will not be repeated here.  For a full discussion of the standard and the five-step process by which the Commissioner evaluates whether a claimant is disabled under the Act, the court refers the parties to its previous decision in *Christiana v. Comm'r of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).  In addition to showing a disability under the five-step sequential analysis, a claimant seeking CIB must also be the child of an insured person who is entitled to old-age or disability benefits or who has died, be dependent on the insured, be unmarried, and demonstrate that her disability began before age twenty-two.  *See* 20 C.F.R. § 404.350(a).

## VI.  Discussion

### A.    Step Three Evaluation

At the third step of the disability evaluation, the ALJ is required to determine whether the claimant's impairments meet or equal an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  *See* 20 C.F.R. § 404.1520(d).  A claimant is presumptively disabled if substantial evidence

---

[2]  The regulations under 42 U.S.C. § 405(g) govern both disability insurance benefits (DIB) and child's insurance benefits (CIB).  *See Borgos-Hansen v. Colvin*, 109 F. Supp. 3d 509, 512 n.2 (D. Conn. 2015).  42 U.S.C. § 1383(c)(3) also renders section 405(g) applicable to judicial review of SSI claims.  As review under both sections is identical, parallel citations to the regulations governing SSI are omitted.

supports that she has a listed impairment. *See id.* § 404.1520(a)(4)(iii), (d).

Gagnon argues that the ALJ erred in her intellectual disability determination under listing 12.05 because she (1) improperly rejected Gagnon's second IQ test results and (2) disregarded her social anxiety. (Dkt. No. 11 at 13-14.) Additionally, Gagnon raises a technical challenge to the ALJ's failure to find an anxiety related disorder under listing 12.06 because she addressed the criteria under subsection (B) and (C), but not the criteria under subsection (A). (*Id.* at 16-17.) The Commissioner responds that the ALJ's determination under listing 12.05 was supported by substantial evidence, and the ALJ properly rejected Gagnon's second IQ test because it was not supported by the record. (Dkt. No. 12 at 4-6.) Regarding Gagnon's alleged anxiety related disorder, the Commissioner asserts that the ALJ did not need to address subsection (A) of 12.06 because he found that Gagnon did not meet either subsection (B) or (C), which already disqualified her from the listed disability. (*Id.* at 6-7.)

1. *Intellectual Disability*

An intellectual disability "refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially

manifested [before age twenty-two]." 20 C.F.R. § 404, subpt. P, app. 1, § 12.05. A claimant is intellectually disabled when, as relevant here, she has an IQ score between sixty and seventy, and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.* § 12.05(C). To meet this listing a claimant must suffer from both cognitive and adaptive limitations.[3] *See id.* § 12.00(A); *see also Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012). Regarding cognitive functioning, there is a rebuttable presumption that an individual will have the same IQ for their entire lives "absent evidence of some sudden trauma that could have negatively affected [a claimant's] mental capacity." *Talavera,* 697 F.3d at 152.

In 2007, when Gagnon was fourteen and a half years old, she earned a verbal IQ score of ninety-five, a performance IQ score of ninety-nine, and a full-scale IQ score of ninety-seven. (Tr. at 276-78.) In 2011, Gagnon was tested again and scored a seventy on her verbal IQ, a seventy-three on her performance IQ, a sixty on her working memory IQ, a sixty-eight on her processing speed IQ, and a sixty-three on her full-scale IQ. (*Id.* at

---

[3] A claimant suffers from adaptive limitations when she does not have the "ability to cope with the challenges of ordinary everyday life." *Talavera v. Astrue*, 697 F.3d 145, 153 (2d Cir. 2012) (internal quotations marks and citation omitted).

336.)  Gagnon attributes the lower 2011 test results to a domestic violence incident in May 2010 where her boyfriend hit her in the head.  (*Id.* at 292-93; Dkt. No. 11 at 9.)

The ALJ weighed the conflicting IQ scores and adopted the 2007 test results as more consistent with the record.  (Tr. at 14-15); *see Juckett ex rel. K.J. v. Astrue*, No. 09-CV-708, 2011 WL 4056053, at *7 n.3 (N.D.N.Y. June 29, 2011) (collecting cases holding that the ALJ has the discretion to reject an IQ score as invalid when it is inconsistent with the record).  Because Gagnon was only fourteen and a half years old at the time of the 2007 IQ test, and two years had passed by the time she applied for benefits, the 2007 results cannot be considered valid.  (Tr. at 181); *see LaRock ex rel. M.K. v. Astrue*, No. 10-CV-1019, 2011 WL 1882292, at *5 (N.D.N.Y. Apr. 29, 2011) (holding that the operative date in evaluating the qualification for benefits is that of the application).  Indeed, IQ scores must be current to accurately assess disability and results obtained before age sixteen are only "current" for two years.  *See* 20 C.F.R. § 404, subpt. P, app. 1, § 112.00(D)(10) (explaining that IQ scores must be current to accurately assess a claimant's disability and that test results obtained between ages seven and sixteen scoring above forty are only current for

two years); *see also Colon-Torres v. Colvin*, No. 6:12-cv-1591, 2014 WL 296845, at *2 (N.D.N.Y. Jan. 27, 2014).

Once the claimant reaches sixteen years old, the regulations point out that her IQ stabilizes and becomes "a valid indication of [her] current status." 20 C.F.R. § 404, subpt. P, app. 1, § 112.00(D)(10); *see Howard v. Astrue*, Civil Action No. 5:11-CV-01397, 2013 WL 1294314, at *9 (N.D.N.Y. Jan. 22, 2013), *report & recommendation adopted by* 2013 WL 1280518 (N.D.N.Y. Mar. 25, 2013). In other words, a claimant's IQ score taken after sixteen years old reflects her current IQ. *See, e.g.*, *Werts v. Comm'r of Soc. Sec.*, No. 5:13-CV-0914, 2013 WL 6078434, at *6, 7 n.15 (N.D.N.Y. Nov. 13, 2014); *see also Talavera*, 697 F.3d at 153 (holding a claimant's IQ is generally the same for her entire life).

Gagnon's 2011 test results were the only scores taken after she turned sixteen and, consequently, represent a more accurate IQ score provided they are valid. *See* 20 C.F.R. § 404, subpt. P, app. 1, § 112.00(D)(10); *Baldock v. Colvin*, No. 1:12-cv-01639, 2013 WL 3467323, at *5 (S.D. Ill. July 10, 2013) (holding that the ALJ should not have considered the claimant's IQ scores from childhood when the record contained a valid adult IQ score). Here, the ALJ rejected Gagnon's 2011

8

test results as invalid because a post-injury CT scan revealed normal brain functioning. (Tr. at 294.) The ALJ also cited Gagnon's testimony that she had always suffered from learning difficulties, and they did not develop after her injury. (*Id.* at 14.) For those reasons, the ALJ dismissed Gagnon's argument that the assault lowered her IQ. (*Id.*) Still, the ALJ did not consider whether Gagnon's 2011 test results could be valid because her IQ dropped for a different reason. Specifically, the ALJ did not recognize that Gagnon's IQ may fluctuate until she turned sixteen, which would explain the difference between the 2007 and 2011 test scores. *See* 20 C.F.R. § 404, subpt. P, app. 1, § 112.00(D)(10); *Colon-Torres*, 2014 WL 296845, at *2.

Whether the ALJ's failure to thoroughly reconcile the two IQ tests amounts to reversible error is immaterial because the "application of the correct legal standard could lead only to one conclusion[]." *See Schaal v. Apfel*, 134 F.3d 496, 504 (2d Cir. 1998). Even considering Gagnon's lower IQ score *arguendo*, the ALJ correctly concluded that she was not intellectually disabled because she maintained adaptive functioning. (Tr. at 14-15); *see Talavera*, 697 F.3d at 153 (holding that a claimant with a qualifying IQ score may still not be disabled if she exhibits adaptive

functioning).  Specifically, the record reveals that Gagnon could independently care for her young children, clean her apartment, and cook meals.  (Tr. at 51, 226-29.)  Gagnon also enjoyed using the computer, talking on the phone, and fishing.  (*Id.* at 229-30.)  Additionally, she reported that she had no problems getting along with her family and friends, which is confirmed by school records.  (*Id.* at 230, 239, 250.)  Although Gagnon had an individualized education program (IEP) in high school, she completed the tenth grade and was enrolled in both special and general education classes.  (*Id.* at 39, 236-55.)  School records indicate that Gagnon had a learning disability but scored well in math and averaged "in the low 80s" in reading, "primarily due to her excellent assignment completion."  (*Id.* at 238.)  After she dropped out of high school, Gagnon enrolled in cosmetology school until she quit largely due to her difficulties standing.  (*Id.* at 41-42.)

Gagnon objects and points to evidence of her social anxiety.  (Dkt. No. 11 at 14-15.)  However, "whether there is substantial evidence supporting the [claimant's] view is not the question"; instead, the court must "decide whether substantial evidence supports *the ALJ's decision*."  *Bonet ex rel. T.B. v. Colin*, 523 F. App'x 58, 59 (2d Cir. 2013).  As

discussed above, substantial evidence supports the ALJ's conclusion that Gagnon does not have an intellectual disability.

### 2. *Anxiety Related Disorder*

To establish disability under listing 12.06 a claimant must prove that she has medically documented findings of certain anxiety-related symptoms. *See* 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.06(A). Additionally, a claimant must show that she meets the requirements of either paragraph 12.06(B) or 12.06(C). *See id.* § 12.06(B)-(C). The ALJ found that Gagnon did not meet the requirements of paragraph (B) or (C). (Tr. at 13-14.) This determination prevented Gagnon from qualifying as disabled and, therefore, the ALJ did not need to analyze Gagnon's symptoms under paragraph (A).

Furthermore, substantial evidence supports the ALJ's determinations under paragraphs (B) and (C). Paragraph (B) requires that the claimant show at least two of the following limitations:

> 1. Marked Restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or

11

> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, § 12.06(B).  A "marked" limitation means "more than moderate, but less than extreme"; one that "interferes seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(C). "Repeated" episodes of decompensation, means "three episodes within [one] year, or an average of once every [four] months, each lasting for at least [two] weeks" or "more frequent episodes of shorter duration or less frequent episodes of longer duration" which are determined, in an exercise of judgment, to be "of equal severity." *Id.* § 12.00(C)(4).

Relying on the consultative psychological evaluation of Christine Ransom and Gagnon's functional report and testimony, the ALJ found that Gagnon did not satisfy the paragraph (B) criteria, because she had only mild restrictions in the activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in concentration, persistence or pace; and no episodes of decompensation.  (Tr. at 13.)  The ALJ presented additional supporting evidence for this finding, as discussed above and below.

Gagnon maintains she meets the paragraph (B) criteria because she has marked difficulties in maintaining social functioning and concentration, persistence, or pace.  (Dkt. No. 11 at 17.)  Specifically, Gagnon argues that she testified at the hearing that her social phobia prevented her from leaving the house and that she relies on her mother to take her grocery shopping.  (*Id.*)  A review of the record reveals that Gagnon's argument exaggerates the extent of her social impairment.  Sukhdeep Ahuja, her treating physician, only anticipated that Gagnon's anxiety would last for four to six months.  (Tr. at 394-95.)  Additionally, Gagnon herself denied having symptoms of anxiety or depression at an evaluation by Dr. Ransom. (*Id.* at 332.)  Finally, Dr. Ransom opined that Gagnon could follow simple directions, perform basic tasks independently, and maintain the concentration to perform these tasks.  (*Id.* at 334.)  Accordingly, Gagnon has not satisfied her burden to establish she meets the criteria in paragraph (B).

Nor does Gagnon meet the criteria of paragraph (C).  Listing 12.06(C) requires that the claimant prove she has medically documented findings which "[r]esult[] in [the] complete inability to function independent[ly] outside the area of [her] home."  20 C.F.R. pt. 404, subpt.

13

P, app. 1 § 12.06(C).  Gagnon does not point to any evidence to support this finding.  The ALJ examined the record and determined it was devoid of any supporting evidence for such a conclusion.  (Tr. at 14.)  Rather, as discussed above, Gagnon reported that she could care for herself and her children as well as engage in some limited activities outside the home including the use of public transportation.  (*Id.* at 225-30.)  Therefore, the ALJ's determination of no disability at this step is also supported by substantial evidence.

## B.    <u>Evaluation of Medical Opinion Evidence</u>

Gagnon argues that the ALJ erred by failing to afford controlling weight to the medical opinion of her treating physician, Dr. Ahuja, and by failing to assess the factors under 20 C.F.R. § 404.1527(c).  (Dkt. No. 11 at 19-21.)  Additionally, Gagnon objects that the ALJ substituted her own judgment for that of a medical expert when she found that Gagnon's psychological symptoms may not be as severe as alleged because she did not consistently receive mental health treatment.  (*Id.* at 17-18.)  The Commissioner contends that the ALJ properly applied the treating physician rule and that her RFC determination is supported by substantial evidence.  (Dkt. No. 12 at 10-12.)  Furthermore, the Commissioner asserts

14

that the ALJ may reject Gagnon's allegations of disability if her treatment regime is inconsistent with her alleged symptoms.  (*Id.* at 7-8.)

Medical opinions, regardless of the source, are evaluated by considering several factors outlined in 20 C.F.R. § 404.1527(c). Controlling weight will be given to a treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  *Id.* § 404.1527(c)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Unless controlling weight is given to a treating source's opinion, the ALJ is required to consider the following factors in determining the weight assigned to a medical opinion: whether or not the source examined the claimant; the existence, length and nature of a treatment relationship; the frequency of examination; evidentiary support offered; consistency with the record as a whole; and specialization of the examiner.  *See* 20 C.F.R. § 404.1527(c).  The ALJ must provide "'good reasons' for the weight given to the treating source's opinion."  *Petrie v. Astrue*, 412 F. App'x 401, 407 (2d Cir. 2011) (citations omitted).  "Nevertheless, where the evidence of record permits [the court] to glean the rationale of an ALJ's decision," it is not necessary that the ALJ "have mentioned every item of testimony

presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Id.* (internal quotation marks and citation omitted).

First, the ALJ properly applied the treating physician rule. The ALJ found that Dr. Ahuja's opinion that Gagnon could not be around people or perform stressful jobs was inconsistent with the record. (Tr. at 16.); *see Halloran*, 362 F.3d at 32 (holding a treating physician's opinion is not entitled to controlling weight where it is not consistent with other substantial evidence). Notably, the ALJ found that Gagnon was around people everyday and performed the stressful duties of child care. (Tr. at 16.) Gagnon frequently visited with her mother, cousin, and friends who lived nearby. (*Id.* at 56, 63, 230.) Additionally, Gagnon testified that she only "felt weird" around people "[she] d[idn't] really know." (*Id.* at 54.) Gagnon also explained that when she brought her children to a nature trail she encountered strangers and would cope by "stop[ping]" or calling someone she knew. (*Id.* at 62.) Finally, T. Bruni, the state psychological consultant, opined that Gagnon was not significantly limited in her social interactions and only moderately limited in her ability to concentrate, remember and follow detailed instructions, and complete a normal workweek without

interruptions from her symptoms.  (*Id.* at 352-53.)

Nevertheless, the ALJ afforded Dr. Ahuja's opinion "some limited weight."  (*Id.* at 16.)  The ALJ reasoned, as discussed above, that Dr. Ahuja's opinion was not consistent with Gagnon's daily interaction with others and her ability to care for her children.  (*Id.* at 17.)  Although the ALJ did not recite every factor under the regulations, her reasoning is sufficiently clear.  *See Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (finding that the ALJ does not need to engage in a "slavish recitation of each and every factor" under 20 C.F.R. § 404.1527(c)).

Next, the ALJ did not substitute her judgment for objective medical evidence.  (Tr. at 16.)  Rather, the ALJ found that Gagnon's subjective complaints regarding her anxiety and social phobia were undercut by her sporadic medical treatment for these impairments.  *See Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989) (holding that a claimant's failure to seek medical treatment "seriously undermine[d]" his contention of disability); *Stroud v. Comm'r of Soc. Sec.*, No. 13 Civ. 3251, 2014 WL 4652581, at *11 (S.D.N.Y. Sept. 8, 2014) (same).

Finally, substantial evidence supports the ALJ's RFC assessment that Gagnon could perform unskilled work with certain limitations.

Regarding Gagnon's physical impairments, her medical records revealed only minor to moderate limitations.  Gagnon's MRI results indicate that she had two central disc herniations and some early degenerative disc disease, but Colin Harris, another treating physician, did not recommend surgery or a discectomy procedure.  (Tr. at 393.)  Rather, he referred her to Juan-Diego Harris, a pain management consultant.  (*Id.*)  Dr. Harris also advised against surgical intervention and instead suggested that Gagnon focus on healthy eating to lose weight and physical therapy to aid her back pain.  (*Id.* at 381.)  Dr. Harris found that Gagnon could walk short distances, climb more than one flight of stairs, and occasionally lift ten pounds.  (*Id.* at 379.)  In fact, Gagnon testified that she often carried her children, albeit with difficulty, who weighed fifteen and twenty-five pounds.  (*Id.* at 49, 58.)

Regarding Gagnon's mental impairments, she denied experiencing symptoms of depression, anxiety, panic attacks, mania, thought disorders or other cognitive deficiencies other than her learning disability when asked by Dr. Ransom.  (*Id.* at 332.)  As noted above, Gagnon did not consistently receive mental health treatment and reported being able to independently care for children.  (*Id.* at 226, 397.)  Furthermore, Drs. Bruni and Ransom opined that Gagnon could perform simple tasks and understand basic

instructions.  (*Id.* at 334, 354.)  Accordingly, the ALJ's RFC determination is supported by substantial evidence.

## C.    <u>Credibility Determination</u>

Gagnon argues that the ALJ erred by discrediting her allegations of pain and symptoms caused by the alleged disability.  (Dkt. No. 11 at 21-24.)  Specifically, Gagnon contends that the ALJ failed to attribute alleged symptoms to particular impairments and did not evaluate her symptoms according to the factors under the regulations.  (*Id.*)  The Commissioner responds that the ALJ properly exercised his discretion to find that Gagnon's allegations were not supported by other medical evidence.  (Dkt. No. 12 at 7-10.)  The Commissioner notes that the ALJ thoroughly compared Gagnon's complaints of pain to other record evidence.  (*Id.*)

Once the ALJ determines that the claimant suffers from a "medically determinable impairment[] that could reasonably be expected to produce the [symptoms] alleged," she "must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry."  *Meadors v. Astrue*, 370 F. App'x 179, 183 (2d Cir. 2010) (internal

quotation marks and citations omitted).  In performing this analysis, the ALJ "must consider the entire case record and give specific reasons for the weight given to the [claimant's] statements."  SSR 96-7p, 61 Fed. Reg. 34,483, 34,485 (July 2, 1996).

Specifically, in addition to the objective medical evidence, the ALJ must consider the following factors: "1) daily activities; 2) location, duration, frequency and intensity of any symptoms; 3) precipitating and aggravating factors; 4) type, dosage, effectiveness and side effects of any medications taken; 5) other treatment received; and 6) other measures taken to relieve symptoms."  *F.S. v. Astrue*, No. 1:10-CV-444, 2012 WL 514944, at *19 (N.D.N.Y. Feb. 15, 2012) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vi)).

The ALJ properly found that Gagnon's allegations that she cannot lift more than five pounds, walk for more than ten to fifteen minutes, and be in groups of people without having a panic attack incredible.  (Tr. at 15-16.) Gagnon's report of her daily activities and testimony at the hearing contradict her alleged disability.  (*Id.* at 51, 226-29.)  Additionally, the medical evidence supporting the RFC determination, *see supra.* Part VI.B, likewise contravenes Gagnon's subjective complaints.  Accordingly, the ALJ properly considered the entire record and discounted Gagnon's

complaints as unsupported by the evidence.

**D.    Remaining Findings and Conclusions**

After careful review of the record, the court affirms the remainder of the ALJ's decision as it is supported by substantial evidence.

## VII.    Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that the decision of the Commissioner is **AFFIRMED** and Gagnon's Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case and provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

February 5, 2016
Albany, New York

Gary L. Sharpe
U.S. District Judge